**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A.J. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 2019-CV-1458-rbs |
| | : | |
| Master Charter High School, et al. | : | |
| | : | |
| Defendants. | : | |

**O R D E R**

AND NOW, on this _____ day of _____, 2022,

upon consideration of Defendants' Motion for Judgment on the Pleadings and Plaintiff's

response thereto, it is hereby ORDERED that Defendants' Motion is DENIED.


**BY THE COURT:**


_____
S U R R I C K, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A.J. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 2019-CV-1458-rbs |
| | : | |
| Master Charter High School, et al. | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

**RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................... 1

II.   PROCEDURAL AND FACTUAL BACKGROUND ........................................ 2

      A.    At thirteen, A.J.'s fellow student rapes her. ..................................... 2

      B.    Mastery investigates; A.J. provides a written statement that she was raped;
            Mastery forces her to discuss the rape in front of her rapist and his father. ....... 3

      C.    A.J. suffers severe trauma and develops PTSD. ................................. 5

      D.    The Pistorius-Richardson Elementary School.................................... 7

      E.    The Office of Civil Rights faults Mastery for its complete failure to follow
            Title IX.................................................................... 8

      F.    Discovery reveals a pervasive pattern of sexual abuse at the school despite
            Mastery's efforts to conceal it................................................ 11

      G.    A serious pattern of other concerning events exists at other Mastery
            locations.................................................................. 13

      H.    Dr. Dragan opines about Mastery's failure to adopt appropriate
            procedures, particularly in light of the pervasive pattern of sexual
            harassment and abuse. ...................................................... 14

      I.    A.J. sues Defendants; this Court denies judgment on the pleadings............. 15

      J.    A discovery dispute remains pending........................................ 17

III.  LEGAL STANDARD ............................................................... 17

IV.   LEGAL ARGUMENT ........................................................................ 18

    A.   Defendants' Title IX arguments fail. ........................................ 18

        i.   The law of Title IX. ................................................... 18

        ii.   Discovery has made Mastery's liability under Title IX even more clear than it was when this Court denied judgment on the pleadings. ................................................................ 20

        iii.   Defendants' new arguments are meritless. ............................ 22

    B.   Defendants' arguments on intentional infliction of emotional distress fail. ...... 24

        i.   A reasonable jury could find that the actions of Mastery's employees was "extreme and outrageous." ........................... 25

        ii.   Defendants acted wrongfully or intentionally. ........................ 25

        iii.   A reasonable jury could conclude that A.J. suffered severe emotional distress. ................................................... 26

    C.   Defendants' arguments on fiduciary duty fail. ............................... 27

        i.   Defendants owed A.J. a fiduciary duty. ............................... 27

        ii.   Defendants breached their fiduciary duty to A.J. ...................... 29

    D.   Defendants are not entitled to tort immunity. ................................ 30

    E.   There is ample evidence to support punitive damages. ........................ 34

    F.   Defendants' motion is not yet ripe because a discovery dispute remains pending. ................................................................ 35

V.   CONCLUSION ........................................................................... 36

## I.      INTRODUCTION

At thirteen, a fellow student raped A.J. The school had no procedures in place to comply with Title IX. It failed to respond to a history of inappropriate sexual behavior predating the rape. And when she reported her rape, it forced her to discuss it with her rapist and his father — not to mention two school officials and two police officers. Based on that inherently coercive and traumatic process, the school refused to credit her report of rape based on an all-but-meaningless statement she supposedly made during it. Relying on its own wrongful process, the school then punished her for being raped. The school refused even to allow her to attend her own graduation.

Now, Defendants try to explain that they somehow did not discriminate against A.J. or deny her the benefits of a public education, inflict emotional distress, or breach their duty of care to her. But their summary-judgment arguments rehash arguments that this Court already rejected when they moved for judgment on the pleadings.

After this Court's order to compel preventing Defendants from hiding critical documents, our case is far stronger now than it was on the pleadings. Defendants' own records show *fifteen separate incidents* at A.J.'s school that reveal a pattern of severe and pervasive pattern of sexual misconduct. One former employee admitted to the possibility of *hundreds* of incidents at Mastery schools.

It was even worse than we had realized. And Defendants tried to sweep it under the rug, labeling A.J.'s rape, another incident of forcible oral sex, and profoundly troubling sexual harassment as "consensual" encounters. Defendants would not even tell the federal governing the truth, falsely claiming to the Department of Education's Office of Civil Rights that A.J.'s incident was the only known impropriety.

In short, this Court's prior analysis denying the vast majority of Defendants' arguments on the pleadings continues to hold and continues to resolve this dispute. This Court should deny summary judgment.

## II.       PROCEDURAL AND FACTUAL BACKGROUND

### A.       At thirteen, A.J.'s fellow student rapes her.

A.J. was a thirteen-year-old student at Mastery Charter Schools' Pastorius Richardson Elementary location. In May 2016, during Ramadan, she looked for somewhere to pray. She went to an open auditorium. (Exh. A: transcript of A.J.'s deposition at 90).

Another student, R.H, entered the auditorium through the front door. A.J. had never spoken to him before. Even so, the first words out of his mouth where, "can I hit it?" (*Id.* at 96).

A.J. refused his demand for sex. Ignoring her, R.H. repeatedly demanded sex at least five times. A.J. continued to refuse. R.H got mad. He told A.J. that she "was acting like a bitch." (*Id.* at 96–99).

R.H grabbed A.J.'s hand. He walked her across a stage in the auditorium. As R.H. pulled up her dress and directed her to a corner of the room, A.J. thought he was going to hurt her. (*Id.* at 100–103).

R.H. pulled A.J.'s underwear down. He pulled out his penis and penetrated her with it. (*Id.* at 103, 106–107).

A.J. implored R.H. to stop, telling him that it hurt. Instead, R.H. "spit on his hand," "rubbed it on himself," and continued to rape A.J. (*Id.* at 106–107).

At some point, R.H. decided to stop. He warned her that she "better not tell nobody." Then he left. (*Id.* at 109).

      **B.**     **Mastery investigates; A.J. provides a written statement that she was raped; Mastery forces her to discuss the rape in front of her rapist and his father.**

Defendant Langston learned of the incident, according to his own statement, on June 9, 2016. Other students became aware of the incident. They told him that his students were "out of pocket." He understood that to mean that they were "not doing what they're supposed to be doing." He explained that it could also mean that the students were "out of control." (Exh. C: Langston's deposition at 136). (Exh. D: Langston notes). While Defendant Langston's students were aware of these problems, he was not.

Instead, another student showed him a video of the rape that R.H. had taken. Defendant Langston had his "tech team" copy the video showing sexual activity of minors. He then showed the video to Defendant Meserve. Next, he called two police officers. (*Id.*). The officers were there so that A.J. could "press charges" not only about the video but also the sexual conduct itself, (Exh. T: Langston interview notes) — necessarily implying his concern that the sexual conduct was non-consensual and so criminal.

Then Defendant Langston summoned A.J. to his office. She did not know that R.H. had filmed the encounter. Dean Langston showed her the video for the first time. He asked her if the video was of her. She said yes. (Exh. A: transcript of A.J.'s deposition at 113–14).

He told her to write a statement about what happened. A.J. wrote a statement explaining that she had been raped:

> I was in there about to pray when R came in and he said he wanted to hit but I said no. Then he just kept on. So then I said I can't. I never did this before. And he said it's okay. So then he pulled my dress up and pulled my underwear down a little. And I was scared to do it, but I did it anyway. And he pulled his thing out and tried to put it in me and I said it hurt so he stopped and we left.

(*Id.* at 115); (Exh. B: A.J.'s statement). Defendant Meserve admitted that this statement reflected A.J.'s lack of consent. (Exh. O: transcript of Meserve's deposition at 65).

Defendant Langston invited A.J.'s grandmother and aunt to the school. Defendant Langston first had a meeting with A.J., her grandmother, her aunt, Defendant Hillary Meserve, and two officers. Making clear that A.J. made allegations of rape, her own grandmother apparently said — according to Defendant Langston's own statement — that: "Oh no, he aint rape you, y'all fucking." Defendant Langston then sent the video to A.J.'s family. (Exh. D: Langston statement); (Exh. C: Langston's deposition transcript at 9, discussing the statement).

At her deposition, A.J.'s grandmother testified otherwise. She believed that R.H. had "threatened" A.J. She stated that A.J. was "raped." And she stated that A.J. never said anything to contrary to that. (Exh. S: R.R. deposition transcript at 63, 95).

Regardless, after discussing matters with A.J. and her family, Defendant Langston invited R.H. and his father into the room. In front of everyone, Defendant Langston asked A.J. what happened. Forced to discuss the incident in front of her rapist and his father, she said that the incident was somehow her "fault." She also said that, at some point during the encounter, she said "okay." (Exh. A at 118–119); (Exh. D).

Despite the allegations of rape and A.J.'s clear written statement to that effect, Defendant Langston was apparently unconcerned. He viewed the event as consensual. (Exh. C at 91).

Even worse, Defendant Meserve agreed at her deposition that she lacked "any concern at all[] that [A.J.] might have been a victim of a rape." (Exh. O at 64–65). She did so even though she admitted that her conclusion require "disbeliev[ing] what A.J." wrote. (*Id.* at 68). Her only explanation at her deposition was that A.J.'s account had "inconsistences" with the video of her rape. (*Id.* at 68). Yet she admitted that her entire investigation during which she concluded that a

thirteen-year-old girl was lying about being raped occurred over a single day. (*Id.* at 76). She did

not believe it "significant" that A.J. was only thirteen. (*Id.* at 85). At her deposition, she claimed

that she "can't speak to" whether a thirteen-year-old girl might be fearful about reporting a rape,

(*id.* at 114), much less in front of her rapist, his father, school officials, and police officers.

      Following the one-day investigation, Defendant Langston claims that both families talked

about the "bad choices" that the students had both made. A.J.'s family was apparently satisfied

that R.H. promised to do yard work to make up for what A.J. had explained was rape. (Exh. D).

      According to A.J., Defendant Langston informed A.J. that she was "expelled," but could

return the following school year. A.J. never returned. In Defendant Langston's words, "all parties

[were] suspended" and "lost their graduation privileges." (*Id.*).

      A.J. would never return to Pastorius-Richardson.

      According to Defendant Meserve, but she and Defendant Langston were responsible for

the investigation and ultimate decision to discipline A.J. (Exh. O at 71). This testimony directly

contradicted Defendants' answer to our pleading, in which they claimed that they had no role in

determining whether the encounter was consensual. *Compare* (Doc. No. 20: Amend. Compl.

¶ 23) *with* (Doc. No. 22: Answer to Amend. Compl. at ¶ 23).


      **C.**     **A.J. suffers severe trauma and develops PTSD.**

      We retained Frank M. Dattilio, Ph.D., a clinical and forensic psychologist to assess A.J.

He reviewed a number of records, including her medical records, treatment records from therapy

providers, various summaries of the incident, and more. His full report is attached as Exhibit E.

This section summarizes his report. A.J.'s underlying medical records are attached as Exhibit F.

      Dr. Dattilio's report discusses A.J.'s lengthy treatment following her rape. Immediately

following the rape, she developed pelvic inflammatory disease — an infection of the female

reproductive organs. Her medical records indicate that, following the incident, A.J. "hate[d] herself" and cried frequently.

A month after the rape, in June 2016, A.J. was diagnosed with PTSD. At intake for therapy, intake personnel concluded that she was "emotionally immature," perhaps because of a family history of autism-spectrum disorder. During treatment, A.J. reported "hearing voices" that frightened her. The voices happened frequently and prevented her from sleeping. A.J. was prescribed antidepressants.

During A.J.'s interview with Dr. Dattilio, she reported that she was initially unable to sleep alone. She was hypervigilant.

Unfortunately, matters worsened. She tried to overdose on prescription medication. Then, in July 2017, she wrapped a belt around her neck and tried to strangle herself.

After A.J. lived to tell the tale, she went to Einstein Behavioral Health. She reported "seeing black stuff telling her to hurt herself." She had constant depression, nervousness, nightmares, and flashbacks to the rape. She would bite and pick at her nails. A physician diagnosed her with major depressive disorder, psychosis, PTSD, and generalized neglect.

A.J. was then admitted on an outpatient basis to the Horsham Clinic. There, A.J. reported sadness, crying, loneliness, isolation, hopelessness, helplessness, isolation, and guilt. She reported intensifying auditory hallucinations telling her "it's all your fault" and suicidal thoughts.

A.J. sought extensive treatment elsewhere at various other providers. We need not continue to detail her extensive treatment but instead refer to Dr. Dattilio's report.

Based on his review of the records and interview with A.J., Dr. Datillio concluded that A.J. "suffered a terrible trauma" arising from her rape. A.J. had never before had sex when she was raped at 13. In addition to the trauma that necessarily results from rape, A.J. knew that

school authorities refused to believe her even though she told them that she was raped. Instead, they looked at the video of her rape and punished her for being raped.

Dr. Datillio believed that A.J. would need continuing treatment for a "significant part of her life."

**D.     The Pistorius-Richardson Elementary School.**

The Pistorius-Richardson Elementary School was initially a public school. In Defendants' own words, it was an "academically struggling elementary school." Defendant Francis D. Pastorius Mastery Charter School converted the school into a charter school to improve matters. The purpose of that effort was to "prepar[e] urban youth for success in elementary education and the global economy." (Exh. N: Management Agreement).

Defendant Francis D. Pastorius Mastery Charter School operates under the broader "umbrella" of the Mastery system. Defendant Mastery Charter High School acts as the "manager" of each school within that system. To that end, it entered into a Management Agreement with Defendant Francis D. Pastorius Mastery Charter School. (*Id.*).

The "umbrella" entity agreed to provide to the elementary school the discipline, supervision, management, and personnel necessary to operate the school. See (Exh. N at ¶ 4.01(a)). The "umbrella" entity also had a variety of other obligations relevant here, such as its ultimate agreement to be responsible for the "Educational Services" at the elementary school, to maintain records, and so on. *E.g.* (*id.* at ¶¶ 1.01(a), 1.02(vii)).

Manager pledged that it had "a unique curriculum" and "innovative teaching methods." It "desire[d] to make [them] more widely available." It pledged to the elementary school that it had the "executive capacity" necessary to carry out that mission. (*Id.*).

**E.      The Office of Civil Rights faults Mastery for its complete failure to follow Title IX.**

The United States Department of Education's Office of Civil Rights investigated A.J.'s rape after a complaint was filed. During the course of the investigation, Mastery's attorneys at Connor, Weber & Oberlies provided an explanation dated February 13, 2017 of what they believe had occurred, which is attached as Exhibit G.

The firm's response admitted that Mastery had "not conducted any surveys that specifically address sexual harassment, sexual assault, and/or whether a hostile environment on the basis of sex exists at the school." In an apparent attempt to justify that, Mastery claimed that the incident with A.J. was the "first and only such incident of which Mastery Charter School" is aware. As we detail later, Mastery's own records — which it tried to conceal in discovery — make clear that claim was false. (*Id.*).

The OCR found that Mastery grossly failed to comply with Title IX. OCR "found that Mastery does not have Title IX grievance procedures." It had no policy specific to Title IX or sexual harassment. It did not treat a Title IX matter differently than any other accusation. It did not even have a Title IX policy at all. Nor did Mastery "have any training specific to Title IX," whether for students, administrators, teachers, or staff. (Exh. H: Jan. 2, 2018 resolution of complaint); (Exh. U: Defendant Meserve's statement to the OCR).

While OCR found that Mastery had a Title IX coordinator, Defendant Michael Patron, he had many other roles at the school. He was Mastery's overall Director of Compliance. In that role, he implemented affirmative-action and equity programs; monitored implementation of Mastery's overall plan and strategies for improvement; communicated with staff, students, and the community; supervised training for Mastery employees; dealt with employment issues; dealt with any grievances that might come up; maintained records; implemented hiring policies; and

– 8 –

performed other duties. "[V]ery few" of his duties involved Title IX. Any time he spent dealing with Title IX "was low." (Exh. H).

The coordinator admitted that he had "very little" training about sexual harassment or violence. He also admitted that he had no role whatsoever in investigating allegations of sexual harassment or violence. He kept no records relating to Title IX. Mastery had no overall policy of what school administrators were supposed to do when they learned of an incident of sexual assault or harassment; instead, the coordinator believed that policies varied from school to school. The coordinator could explain only what he "expect[ed]" staff would do in case of sexual assault or harassment. Nor did the coordinator even *know about* the incident with A.J. until after the OCR complaint was filed. (Exh. V: Patron OCR interview notes).

Even Mastery staff had doubt about whether the supposed Title IX Coordinator held that role. At his deposition, we asked Defendant Langston whether Mastery had a "Title IX Coordinator" when A.J.'s rape occurred. He identified the same person as did the OCR but could not claim that he actually served as a Title IX Coordinator. Instead, Defendant Langston Langston referred to him "as like our legal person, not counsel, but he goes through all of our processes." Defendant Langston did not "know if we had an actual Title IX coordinator at that time." (Exh. C at 36–37).

Besides the overall absence of any meaningful Title IX policies or compliance, the OCR also faulted Defendants for failing to follow Title IX in investigating the incident between A.J. and R.H. Even setting aside the dispute over whether A.J. was raped or consented, it was undisputed that A.J. did not consent to being filmed. OCR found that Mastery failed to investigate whether the video created a sexually hostile environment for A.J. Nor did OCR find

any evidence that Mastery had disciplined R.H. for filming the video or distributing it — only the supposedly consensual sexual conduct. (*Id.*).

OCR and Mastery entered into a comprehensive Resolution Agreement dated December 22, 2017 to address the complaint. OCR found that it was necessary for Mastery to take all of the steps outlined in the agreement to "be in compliance with Title IX" with respect to the issues raised in the agreement. (Exh. I: Resolution Agreement).

Broadly speaking, the Resolution Agreement required Mastery to: (1) implement Title IX grievance procedures; (2) provide notice to students, parents and guardians, and employees regarding the grievance procedures; (3) create and publicize a notice of non-discrimination; (4) provide Title IX training for its Title IX Coordinator and any other employees involved in responding to complaints of sexual discrimination or harassment; (5) provide Title IX training to all staff who interact with students on a regular basis; (6) offer counseling services to A.J; (7) improve its record-keeping processes regarding Title IX grievances; and (8) prepare a report summarizing all incidents alleging sexual harassment at Pastorius Elementary School. (*Id.*).

Even after OCR and Mastery entered into the Resolution Agreement, Mastery's Title IX coordinator had little idea how to comply with Title IX. In April 2018, he sent an email to OCR requesting assistance to "find[] training for myself as Title IX Coordinator and investigator." The Coordinator also asked for "sample documents to comply with our obligations," including grievance procedures, notices of non-discrimination, and investigation procedures. (Exh. Q: Patron deposition transcript at its own Exhibit K).

**F.**     **Discovery reveals a pervasive pattern of sexual abuse at the school despite Mastery's efforts to conceal it.**

This sexual abuse was not the first that had occurred at A.J.'s school. In our pleading, we alleged several prior incidents of sexual abuse. A 2008 Philadelphia Inquirer article reported wide-spread sexual misconduct. Following the discovery of a sexual encounter between two eight-grade students in a stairwell, a school employee stated that sexual activity was "rampant" among young students. More troublingly, young girls signed "sexual contracts" pledging themselves to boys.

During suit, R.W., a student at the same school, confirmed many of these details. Our investigator took his statement. Most relevant, R.W. reported that the *very place that A.J. was raped* — the auditorium — was a known location where students would have sex. It was well known that students could access the auditorium even when it was not in use. *See* (Exh. J: statement).

In discovery, we sought to obtain additional documents showing the pattern of sexual misconduct and abuse at Mastery schools. Mastery did everything it could to conceal them.

Defendants responded to our document requests in August 2019. It would later became clear that Defendants had not provided documents relating to incidents of sexual misconduct at Mastery. In October 2021, we moved to compel their production.

In early December 2021, this Court granted the motion. Despite Mastery's prior refusal to produce any such documents, Mastery finally produced documents reflecting *fifteen separate* incidents of misconduct. (Exh. K, L).

Each incident was labeled an incident of inappropriate but "consensual" sexual behavior. A.J.'s rape was one of the fifteen "consensual" incidents. Mastery's report did not mention A.J.'s

written statement making clear that she was raped, explaining only that a sexual encounter occurred:

> AJ and RH are on camera having sex in the auditorium, RH recorded himself having sex with AJ. Afterward, RH showed MD the video. MD sent the video to her phone from RH's phone. MD sent that video to multiple students.

(Exh. K.)

That was not even Mastery's worst false description of its own records. Instead, Mastery labeled a *second*, indisputable rape an example of "consensual" sexual behavior. Mastery's own report stated that one student shoved another student down, removed his penis, and inserted it into the other student's mouth without consent. The report does not explain how anyone could possibly think that forcible oral sex is "consensual" sexual behavior. (Exh. K, L).

Defendant Meserve admitted that she was subjectively aware of that incident and met with the victim's mother. (Exh. O at 116). Defendant Langston was also aware of the incident because he personally investigated it. (*Id.* at 117).

Another report discussed deeply concerning sexual violence. A teacher reported a student "harassing numerous girls in his class," including by "gyrating" behind them and grabbing their hair while they expressed that their displeasure. Somehow, Mastery concluded that this incident was also "consensual." (Exh. K).

Other reports of "consensual" behavior also reflected physical sexual harassment. A number involved non-consensual groping or slapping of intimate portions of the body. Others described verbal sexual harassment. (*Id.*).

As we discuss later, we do not believe that Mastery has even now provided a full accounting of the pattern of sexual abuse and misconduct. Nor did Mastery disclose any of these

incidents to OCR despite OCR's direct request for any such record. (Exh. G) (responding to query 9). Instead, it falsely stated that it had no record of any such prior sexual misconduct. (*Id.*).

### G.    A serious pattern of other concerning events exists at other Mastery locations.

At her deposition, Danielle Iannacco — a social worker with Mastery — testified about other incidents. She worked at a different Mastery location — the Harrity Elementary School. A student at that school, Z.G., accused the dean of sexually abusing her. (Exh. R. at 25–26).

In the Z.G. case, Ms. Iannacco gave a deposition. We sought the deposition transcript but this Court declined to grant our motion to compel its production.

Regardless, MS. Iannacco's deposition in this case sheds light on broader problems within the Mastery system. A pleading in the Z.G. case alleged that Ms. Iannacco "reported hundreds of incidents of sexual misconduct by and between students and students and teachers" at Mastery's Harrity location. While Ms. Iannacco claimed that the pleading mischaracterized her testimony, she then admitted that it was essentially accurate:

> Q. In regard to -- it says "hundreds of instances". Is that accurate?
>
> A. I'm not sure. At the time of the deposition he — that particular lawyer was really pushing me for a number after I reread it, and I think — and at one point he said "hundreds," and I said "sure". But, no, I can't give a definitive number.
>
> Q. And you testified under oath as to hundreds, correct?
>
> MR. JENNINGS: Objection to form. You can answer.
>
> THE WITNESS: I, at the time, felt that that was an accurate number. Looking back, in retrospect — so I testified to the — you know, to the best of my ability. At this point looking back, I can't say with certainty that there is an exact number that I can assign.

H.      **Dr. Dragan opines about Mastery's failure to adopt appropriate procedures, particularly in light of the pervasive pattern of sexual harassment and abuse.**

Plaintiff's retained Edward F. Dragan, EdD, as an expert witness. His full report is attached as Exhibit M.

Dr. Dragan holds a doctoral degree in education administration and supervision and a master's degree in education law. He worked as a teacher, administrator, principal, director of special education, and superintendent of schools. He also worked for New Jersey's Department of Education. In that role, he trained school administrators regarding student and staff supervision, and developed policies and procedures. He also provided extensive training and teaching on a variety of topics, including protecting students from sexual harassment and abuse.

Dr. Dragan opined that Mastery was deliberately indifferent to the rights of its students, including A.J. He based on that opinion on:

- Mastery's failure to implement a proper anti-harassment policy as federal law requires.

- Mastery's failure to recognize the foreseeability of student sexual misconduct and violence based on the prior history of sexual misconduct.

- Failure to implement proper Title IX policies.

- Failure to have adequate notice and grievance procedures under Title IX.

- Failing to provide Title IX training.

- Failing to conduct an appropriate investigation.

- Forcing A.J. to face R.H. during the investigation.

- Failing to take any steps to address retaliatory conduct against A.J.

Dr. Dragan found that Mastery's breaches and failures were an "inexcusable" failure to comply with Title IX. He found that its behavior "would shock the conscience of any reasonable school administration" and represented "an egregious level of disregard and indifference towards its vulnerable students." Dr. Dragan's report included any number of additional failings and facts relevant to Mastery's failings.

## I.       A.J. sues Defendants; this Court denies judgment on the pleadings.

A.J. sued Defendants Mastery Charter High School, Mastery Charter School Pistorius-Richardson Elementary School, Scott Gordon, Hillary Meserve, and Eric Langston. She pled four causes of action: (I) violation of Title IX; (II) violation of the Fourteenth Amendment's guarantee of equal protection of the laws; (III) intentional infliction of emotional distress under Pennsylvania law; and (IV) breach of fiduciary duty under Pennsylvania law.

Defendants initially defaulted. After this Court opened the default, they moved for judgment on the pleadings on every single count. On the Title IX claim, Defendants claimed that the Complaint failed to establish the "deliberate indifference" to A.J.'s rape necessary to state a claim. Next, Defendants claimed that the Equal Protection Clause did not create in students any right to protection from rape by fellow students or that qualified immunity would apply to the individual defendants because any such right was not clearly established. As to intentional-infliction of emotional distress, Defendants claimed that they did not engage in "extreme and outrageous" behavior. As to fiduciary duty, Defendants claimed that they had no fiduciary duty to A.J.

– 15 –

Defendants also made various other arguments. They claimed immunity under Pennsylvania's tort-immunity statute, the Tort Claims Act, 42 PA. CONS. STAT. § 8541, *et seq.* They also challenged the viability of A.J.'s claim for punitive damages.

This Court denied the motion, except as to the Fourteenth Amendment claim. As Defendants now restate many of the same arguments at summary judgment, we discuss this Court's reasoning to reject the same arguments last time.

On Title IX, this Court explained that sexual harassment violates Title IX when it is "so severe, pervasive, and objectively offense . . . that the victim students are effectively denied equal access to an institution's resources and opportunities." (Doc. 29) (citing *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 205–06 (3d Cir. 2001)). Proving that requires "deliberate indifference to known acts of harassment" or showing a "systemic effect on educational programs and activities." *Id.*

This Court found that not only the entities but also Defendants Meserve and Langston were subject to suit. This Court based that finding on our allegations that they investigated the video, contacted police, initiated the meetings with A.J. and R.H.'s families, attended the meetings, and punished A.J.

On the substance, this Court found that we alleged sufficient facts to support Title IX liability. Together, the combination of the lack of Title IX policies; the pattern of student-on-student sexual misconduct involving the 2008 "stairwell" incident, the "sexual contracts," and a 2016 sexual assault; the failure to respond to these incidents; and Mastery's response to A.J.'s was sufficient to state a claim.

On the IIED claims, this Court found that Defendants' conclusion that A.J. had consented even though she said otherwise, their actions in suspending her, and our allegations that

Defendants had a subjective desire to "deflect blame from themselves" were enough. This Court rejected the tort-immunity claim on IIED because any commission of an intentional tort necessarily establishes the "willful misconduct" that abrogates Pennsylvania's tort-immunity statute. This Court found that punitive damages were necessarily available for a claim of sufficiently pleading "willful misconduct."

On the fiduciary-duty claim, this Court found that Defendants had "overmastering dominance" over A.J. and because educators necessarily owe a fiduciary duty to their students regardless of "overmastering dominance." This Court found that Defendants' failure to comply with Title IX, punishing A.J., and response to A.J.'s rape breached their fiduciary duty.

This Court also rejected Defendants' immunity argument on the fiduciary-duty claim. This Court found that Defendants engaged in the willful misconduct that abrogates Pennsylvania's immunity statute because A.J.'s emotional distress was the "substantially certain" result of Defendants' actions. This Court also rejected the punitive-damages argument for the same reasons that it had adopted in considering the IIED claim.

## J.    A discovery dispute remains pending.

As discussed above, during discovery and only after an order to compel, Defendants disclosed *fifteen* prior incidents of sexual assault, abuse, or harassment. As detailed in our pending motion for sanctions, Mastery appears to continue to withhold complete descriptions of the pattern of abuse at the school and possibly other records.

## III.    LEGAL STANDARD

The Third Circuit has recently explained review of a summary-judgment motion as follows:

> Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. As explained by the Supreme Court, for a factual dispute to be material, its resolution must have the potential to affect the outcome of the suit. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, but the mere existence of a scintilla of evidence favoring the non-moving party will not prevent summary judgment. Still, in assessing the genuineness of a potential factual dispute, inferences from the underlying facts should be drawn in favor of the nonmoving party. But if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial, then summary judgment is appropriate for the moving party.

*SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203–04 (3d Cir. 2022) (cleaned up).

## IV.      LEGAL ARGUMENT

We first address Defendants' grounds for summary-judgment in the order that they raised them. We then address why this Court should defer ruling on the motion until after it resolves the pending discovery dispute.

### A.      Defendants' Title IX arguments fail.

#### i.      The law of Title IX.

Title IX provides: "[N]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 168l(a). There is no dispute that Defendants Mastery and the School are recipients of federal education funding and that the requirements of Title IX are applicable to them. The only question is

whether Defendants subjected A.J. to discrimination, excluded her from participation in educational programs or activities, or denied her their benefits.

The parties agree that a Title IX claim for damages may rely on student-on-student harassment. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999). "[W]here the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities" and where the harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit. *Id.*

Deliberate indifference may be demonstrated where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. *Id.* at 648-649. The school may be liable where its deliberate indifference causes "[students] to undergo harassment or make them liable or vulnerable to it. *Id.* at 645 (internal quotations omitted). *Id.* at 656, 648–49.

A recipient of federal funds may be liable for the harassment where "the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." Where the misconduct occurs during school hams and on school grounds, or otherwise under the supervision of school employees, the [school] retains substantial control over the harasser and the context in which the harassment occurs. *Id.* at 645–56.

This rule recognizes "the importance of school officials' comprehensive authority . . ., consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Discipline requires not only that "students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities." Schools have even

greater responsibility for those under their care than employers because they have "even greater" "ability to control and influence behavior." *Id.* at 646-647.

A Title IX claim "depends on a constellation of surrounding circumstances, expectations, and relationships." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998). Those include without limitation the ages of the harasser and the victim and the number of individuals involved. *See* OCR Title IX Guidelines 12041-12042; *Davis*, 526 U.S. at 65; *see also Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 205–06 (3d Cir. 2001).

Even a single instance of harassment can create liability under Title IX. *Davis*, 526 U.S. at 652-653; *see also Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as . . . severe, pervasive, and objectively offensive sexual harassment"); *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (noting that, in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*,595 F.3d 679, 686 (7th Cir. 2010) (similar) (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007)).

      **ii.**       **Discovery has made Mastery's liability under Title IX even more clear than it was when this Court denied judgment on the pleadings.**

There is no reason for this Court to change the conclusion that it made on the pleadings. There is no dispute that Mastery failed to comply with Title IX, as the OCR found. For instance, they entirely failed to create a Title IX policy or grievance procedures. 34 C.F.R. § 106.8(b), (c).

Nor did they do anything to address the pervasive pattern of sexual abuse and harassment at A.J.'s school. Nor, as the OCR found, did they properly investigate A.J.'s rape.

The evidence also permits a reasonable jury to find the "deliberate indifference" necessary to support a cause of action for damages for several reasons. Under A.J.'s account at her deposition, Defendants failed to respond appropriately to A.J.'s rape. Instead, even after she provided a written statement explaining that she was raped, they forced her to discuss that rape in front of her rapist and his father. Defendants provide no meaningful explanation for this behavior — which explanation would be irrelevant anyway since it is for the jury to decide between competing accounts.

These events are particularly actionable because of the young age of the victims of Defendants' pattern of wrongdoing. This case, to restate the obvious, involves a thirteen-year-old girl. The law demands strong steps to protect young children from sexual abuse. Mastery's failure to provide it is part of the "constellation" of circumstances that this Court should consider under *Oncale*.

These events also come in the wake of a clear pattern of sexual abuse and misconduct. Even with the outstanding discovery issues, Defendants have admitted to actual notice of *fifteen* incidents about which they have written records — including yet another rape. And Ms. Iannacco's deposition reveals possibly *hundreds* of incidents at other Mastery locations.

These patterns put Defendants on notice of the need to address the problem, yet they refused to do so. Their actual notice of the problem and refusal to do anything about it is exactly the evidence from which a reasonable jury could make a finding of deliberate indifference. While Defendants Despite their quibbling over when some of the events occurred, courts consider evidence of incidents years prior in assessing a school's obligation to respond to a

pattern of sexual harassment. *See, e.g.*, *Simpson v. Univ. of Colorado*, 500 F.3d 1170 (10th Cir 2007) (considering a single assault from 1997 in assessing a claim that arose in 2001).

### iii.    Defendants' new arguments are meritless.

Trying to avoid the same result that this Court already reached last time, Defendants' summary-judgment motion points only to a minor discrepancy between our pleading and the record that the parties developed. At its core, Defendants have shown nothing more than that Defendant Langston responded more promptly to the issue than we believed at the outset of this case. But that is immaterial. The real problem here was not how quickly Defendants acted. It is *what they did*. Defendants motion at best tries to ignore that issue by emphasizing a triviality over substance.

What really happened in discovery is that we found even more evidence establishing Defendants' deliberate indifference. Before discovery, our pleading could rely only on the information known to us: the "stairwell" incident, the pattern of inappropriate but consensual behavior, and the response to A.J.'s rape. Now, discovery has revealed more information supporting our claims.

This Court compelled Defendants to give us a fuller accounting of the pattern of misconduct after they refused to do so. Defendants have now admitted to *fifteen* separate documented incidents. These included yet another rape and a serious pattern of sexual harassment. And R.W. provided evidence that the *very place that A.J. was raped* was a known location for inappropriate sexual behavior.

Yet Defendants failed to address the problem. Instead, Mastery labeled A.J.'s rape and a separate incident of forcible oral sex as "consensual" behavior. After sweeping the problem under the rug with a convenient label, there is no indication that Defendants did anything to fix

the problem under OCR got involved. There is no indication that any steps were taken to meaningfully redress these problems until the OCR got involved. It was only then that Mastery agreed to take steps to comply with Title IX — and then only to settle the claim before the OCR.

All that remains of Defendants' argument are misstatements of fact or reliance on irrelevancies. Defendants claim that no member of Mastery staff saw the video of the rape except Defendant Langston. But Defendant Meserve did too, at minimum.

Next, Defendants dwell on the fact that it was supposedly reasonable for them to conclude that A.J. consented to sex. That is both irrelevant and false. Most importantly, Defendants *did nothing about a pervasive pattern of sexual misconduct*. Even if their investigation of the A.J. incident were somehow appropriate, that does not absolve them of liability. The OCR made a similar finding, noting Mastery's violation of Title IX regardless of consent.

In making their argument, Defendants also misunderstand the law. They claim that they are liable only if their conclusion that A.J. consented is "clearly unreasonable." (Br. 11) (citing *Davis*, 526 U.S. at 648–49). But, under *Davis*, what matters is if the "response to the harassment or lack thereof is clearly unreasonable." Even if Defendants' conclusion were somehow correct, that does not mean that they can brand A.J. with a scarlet letter and then claim immunity from Title IX. Instead, regardless of whether Defendants reached the right conclusion, they violated Title IX by failing to respond to the events involving A.J. appropriately and by failing to respond to the known pattern of inappropriate sexual behavior.

Moreover, a reasonable jury could easily conclude that Mastery's investigation was inappropriate. Defendants Langston and Meserve *forced A.J. to discuss her rape in front of her rapist and his father*, not to mention her family, two police officers, and themselves. They

concluded that the incident was consensual on the meagerest of grounds. And they did so only after A.J. gave a written statement explaining clearly that the encounter was *not* consensual.

Defendants' summary-judgment motion asks this Court not only to take a disputed factual question away from the jury, but to decide it in an absurd way. It is hard to imagine a jury that would sign off on the traumatic procedures to which the Defendants subjected A.J., much less on the notion that a *thirteen-year-old girl's* account of rape is incredible. And it is especially unlikely that a jury would reach that conclusion after an expert tells them how grossly inappropriate Mastery's procedures were, and after a psychiatrist tells them about the difficulty that rape victims have in discussing the traumatic experience that they suffered.

Compounding its errors, Defendants next claim that we rely on a "single incident on a single day." We do not. By now, it is clear that we are relying on *years* of misconduct that Defendants did nothing about and instead tried to sweep under the rug.

In sum, this Court properly denied judgment on the pleadings. Our case is even stronger than it was on the pleadings. The arguments to which Defendants must resort show that there is no reason to take this case from the jury.

### B.      Defendants' arguments on intentional infliction of emotional distress fail.

A defendant is liable for intentional infliction of emotional distress for "extreme and outrageous conduct [that] intentionally or recklessly causes severe emotional distress to another." *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1998) (citing Restatement (2d) of Torts § 46(1) (1965)). All requirements are satisfied.

### i.    A reasonable jury could find that the actions of Mastery's employees was "extreme and outrageous."

There is more than enough evidence to support a jury finding that Mastery's employees intentionally inflicted emotional distress on A.J. They watched the video of her rape and questioned about her. Then, disbelieving her account of rape, they questioned her about her rape in front of her rapist and her rapist's father, themselves, and two police officers. After coercing her statement in horrendous circumstances, they punished her for being raped.

No decent person would subject A.J. to the investigation to which they subjected her, much less punish her based on it. And our experts' opinions will show the plain absurdity of Defendants' actions and their horrific consequences on a young girl's life.

Defendants' only response is to ignore the bulk of the evidence. Defendants instead focus on the fact that they: (1) investigated promptly; (2) did not distribute child pornography — the video of A.J.'s rape — except internally as part of their investigation, to the police, and to A.J.'s guardian; and (3) relied on A.J.'s supposed claim during a meeting with her rapist and his father that she said "okay" at some point during the encounter.

None of this says much for Defendants. None of it excuses Defendants' other conduct. By ignoring the bulk of the abuse to which they subjected A.J., Defendants miss the point. We have provided ample evidence from which a reasonable jury could find for A.J.

### ii.    Defendants acted wrongfully or intentionally.

Defendants directly caused the actions listed above. Their actions were necessary intentional. As this Court found last time, the emotional distress that A.J. suffered necessarily followed from them.

While that is enough to deny Defendants' request for summary judgment, a reasonable jury could also conclude even that Mastery's ultimate conclusion that the encounter was consensual was reckless. Despite the difficult circumstances, A.J. gave a written statement that made clear that R.H. raped her. The tepid statement of "okay" that Defendant Langston solicited in front of her rapist is all but meaningless. Rape is a horrible crime that creates decades of lasting trauma even for adults. For a young girl to suffer it and then to force her to process her own beliefs about the event in front of her rapist and his father is plainly unreasonable. Defendants Langston and Meserve knew of these risks because he was personally at the meeting and subjected A.J. to them. Yet they disregarded them.

Then Mastery made things worse. It relied on her plainly unreliable statements to punish her for being raped. Punishing a girl despite actual knowledge of her allegation of rape could not but be the conscious disregard of the risk that she would suffer emotional distress after authority figures responsible for her well-being refused to believe her and then punished her for being a victim.

### iii.    A reasonable jury could conclude that A.J. suffered severe emotional distress.

We need not say much on this point. The combined effects of the rape and Defendants' response to it caused multiple psychological illnesses, hallucinations, horrible trauma, multiple suicide attempts, and conditions that Dr. Datillio believes will require years of treatment. He will opine that Defendants' actions contributed to these injuries. If anything is severe emotional distress, the lifelong trauma that A.J. suffered qualifies.

### C.     Defendants' arguments on fiduciary duty fail.

Mastery incorrectly claims both that it had no fiduciary duty to A.J. and that there is no evidence that it breached that duty even if it existed. Both claims ignore the record before this Court.

### i.     Defendants owed A.J. a fiduciary duty.

Mastery's claim that it had no fiduciary duty to A.J. fails for two reasons. First, Pennsylvania courts have already determined that schools necessarily have a fiduciary duty to their students without considering anything else. "[A]allegations of sexual abuse or exploitation" reflect "the most serious breach of an educator's fiduciary duty to a student." *Whalen v. Dep't of Educ.*, 161 A.3d 1070, 1079 (Pa. Commw. Ct. 2017). Mastery's claim that it has no fiduciary duty at all when the evidence we presented would establish the "most serious breach" of that duty possible is absurd. *See also Insight PA Cyber Charter Sch. v. Dep't of Educ.*, 162 A.3d 591, 605 (Pa. Commw. Ct. 2017) (discussing a charter school's board's "fiduciary duty to the charter school and the students"); (Doc. 29: Op. denying judgment on the pleadings at 22) (citing *K.A*, 28 F. Supp. 3d 356, 377 (E.D. Pa. 2014) and *Vicky M.*, 486 F. Supp. 2d 437, 458 (M.D. Pa. 2007)).

Second, the circumstances of this case show that Mastery had "overmastering influence" over A.J. regarding the investigation into her rape. It had the power to force her to discuss the incident in front of her rapist and his father, two officers, and school officials — and then to punish her for what she said in such horrific and difficult circumstances. That is enough.

As Defendants correctly state, a fiduciary duty arises as a result of certain "confidential relationship[s]." Those included, relevant here, "guardian and ward." Where the plaintiff puts her "trust and reliance" in the defendant, and the defendant has an opportunity to "abuse that trust for

personal gain on the other," overmastering influence can arise. During such a relationship, the dominant party owes a duty of "scrupulous fairness and good faith." (Br. at 15–16) (citing *Welley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 218 (Pa. Super. 2012)).

Defendants claim that it had no overmastering influence because it did not "attempt to coerce her in any way." That is both besides the point and unavailing. First, a fiduciary duty can arise from "overmastering influence" even without actual coercion. Instead, Pennsylvania law asks whether there is an opportunity to abuse trust.

Necessarily, a school has an opportunity to abuse the trust of its students. Students are compelled to attend school. They are subject to its discipline. Except as to certain "off-campus" actions, educators stand *in loco parentis* to students. *Appeal of G.S. by & through Snyder*, No. 843 C.D. 2020, __ A.3d __, 2022 WL 67262, at *8 (Pa. Commw. Ct. Jan. 7, 2022). Mastery exercised — albeit improperly — that profound grant of authority to punish A.J. for being raped. Exactly how an institution claiming the authority to do that lacked an opportunity to abuse trust and reliance is unclear not only substantively but also because Mastery never explains it.

Instead, Mastery simply ignores the substance of what it did and paints the evidence in the light most favorable to it — contrary to this Court's standard of review. Mastery characterizes its decision to force A.J. to address her rape in front of R.H., R.H.'s father, police officers, and her apparently unconcerned family members as laudable.

Instead of viewing these actions as less likely to get to the truth of a traumatic event difficult to discuss, Mastery claims that somehow it was a good thing. Mastery strangely believes that the meeting allowed "everyone involved" to come to the "consensus" that A.J. was not raped but instead "engaged in consensual sexual intercourse." Supposedly, this "consent" building process bars any finding of coercion.

Mastery has an interesting story to tell a jury. But this Court should not adopt that story at summary judgment. Instead, the jury is free to decide — as we believe any reasonable person would — that it was a bad idea to force a young girl to discuss her rape in front of her rapist, his father, school officials, and police officers without her desire to talk to them. A reasonable jury could properly find that these actions were coercive, not a happy effort to build "consensus" that A.J. was to blame for supposedly saying "okay" once after repeatedly refusing R.H.'s improper and unwanted advances.

### ii.  Defendants breached their fiduciary duty to A.J.

For similar reasons, a reasonable jury could conclude that Mastery breached its fiduciary duty to A.J. Defendants focus on their supposedly prompt action in responding to the incident. But that misses the point. Even if Defendants acted promptly, that does not discharge their duty. In fact, they failed to discharge that duty for the reasons we have repeatedly explained above— through their improper and coercive investigation, by subjecting A.J. to a discussion of her rape in front of her rapist and his father, by sharing the video of her rape, and by punishing her for being raped.

Further, Mastery's claim that its employees had no personal motive at issue in brushing away concerns that A.J. was raped belies the record. Mastery knowingly concealed any number of reports that students under its care suffered not only forcible oral sex, but repeated physical and verbal sexual harassment and assault. It did that not only internally by falsely describing them as "consensual," but also during the OCR's investigation and even in discovery during this litigation.

Defendants had every interest in concealing the evidence for the obvious reason that they are subject not only to litigation but also federal investigation for their severe wrongdoing. Even

though Defendants successfully lied to the OCR such that the scope of its pattern was not evident, the OCR still imposed severe consequences. Who knows what else would have happened not only during the OCR investigation but otherwise if Defendants had owned up to the truth. To suggest that Defendants had no improper interest in concealing wrongdoing is contrary to commonsense, the facts, and basic human nature. Defendants' argument that no reasonable jury could conclude otherwise is simply wrong.

### D.  Defendants are not entitled to tort immunity.

This Court has already rejected the same immunity arguments that Defendants now repeat. We agree with this Court's prior analysis and adopt it here.

To briefly summarize, as to the IIED claim, this Court properly found that the commission of an intentional tort necessarily reflects "willful misconduct," abrogating tort immunity under 42 PA. CONS. STAT. § 8550. As Defendants accurately state, willful misconduct ordinarily is "synonymous with the term 'intentional tort.' " *See* (Br. 19) (quoting *King v. Breach*, 540 A.2d 976, 981 (Pa. Cmwlth. 1988).[1] We have already explained above why Defendants' employees are responsible for intentional infliction of emotional distress. As this

---

[1] There is a limited exception for police misconduct, which may require a higher standard of a subjective intent to commit a wrongful act. Several years ago, the Pennsylvania Supreme Court dismissed an allocatur petition on that issue as improvidently granted and the Court has not yet settled it. *Renk v. City of Pittsburgh*, 641 A.2d 289, 293–94 (Pa. 1994) (finding that an officer commits "willful misconduct" so as to abrogate his right to indemnity only if he subjectively knew that he is committing a wrongful act); *Cruz v. Madonna*, No. 1748 C.D. 2015, 2017 WL 386177 (Pa. Cmwlth. Jan. 27, 2017) (unreported) (finding that the same analysis does not apply to abrogation of immunity and that instead mere commission of an intentional tort suffices to create liability); *Cruz v. Peachey*, 200 A.3d 440 (Pa. 2019) (dismissing the defendants' allocatur petition in *Cruz v. Madonna* as improvidently granted).

However, that issue is not relevant to this appeal. Instead, all that matters is that a reasonable jury could conclude that the individual defendants committed an intentional tort.

Court found last time in its opinion on the Defendants' motion for judgment on the pleadings, that establishes that they also engaged in willful misconduct.

We also agree with this Court that a reasonable jury could conclude that Defendants knew that A.J.'s emotional distress was essentially certain to follow from their conduct. That creates a basis to find the "willful misconduct" that abrogates immunity as to the breach-of-fiduciary-duty claim.

Before moving on, we also provide an additional argument that we have not raised earlier. There is another exception to tort immunity as to the breach-of-fiduciary-duty claim.

Under the Tort Claims Act,[2] local governments are presumptively immune from all tort claims. 42 PA. CONS. STAT § 8541. The employees of a local government presumptively share that same immunity. 42 PA. CONS. STAT. § 8545. We agree that these same rules apply to the employees of charter schools, such as Mastery.

The statute provides exemptions from immunity in nine categories of cases. We set forth the nine categories in full because their nature is the core of Defendants' misunderstanding of the Tort Claims Act. Local governments can be liable for: (1) their operation of motor vehicles; (2) their care of others' personal property; (3) their care of their own real property; (4) dangerous conditions of trees, traffic controls, and street lighting in the public right-of-way; (5) dangerous conditions of public utilities; (6) dangerous conditions of public streets; (7) dangerous conditions of public sidewalks; (8) the actions of animals in their control; and (9) **injuries involving sexual abuse**. *See* 42 PA. CONS. STAT. § 8542(b).

---

2 The statute is codified at 42 PA. CONS. STAT. §§ 8541, et seq. The statute has no official short title. However, it reflects a codification of Pennsylvania's former "Political Subdivision Tort Claims Act." We refer to the Tort Claims Act as such to distinguish from its uncodified predecessor.

Fundamentally, Defendants do not understand the nature of these exceptions. They claim that any suit for breach of fiduciary duty is inherently outside of the scope of the exemptions. In their view, because the statute does not create an exemption that says: "(10) claims for breach of fiduciary duty" they are entitled to immunity.

But Defendants mischaracterize the nature of the exemptions. They do not apply to particular causes of action. They instead consider *how the injury arose*. *See, e.g.*, *McShea v. City of Philadelphia*, 995 A.2d 334 (Pa. 2010) (analyzing a breach-of-fiduciary-duty claim to determine whether it fit within the "personal property" exception). If the local government misused a car, causing an injury, it does not matter what cause of action the plaintiff pleads. An injury caused by the local agency's driving is within the exemption.

Here, A.J.'s claims are within the exemption of 42 PA. CONS. STAT. § 8542(b)(9). The General Assembly recently adopted the sexual-abuse exemption. Its amendment followed public outcry about sexual abuse not only in the Commonwealth, but also throughout the nation. It abrogates immunity for:

> Conduct which constitutes an offense enumerated under section 5551(7) (relating to no limitation applicable) if the injuries to the plaintiff were caused by actions or omissions of the local agency which constitute negligence.

Under subsection (b)(9), we must show that: (1) A.J. was the victim of an offense outlined in 18 PA. CONS. STAT. § 5551(7); and (2) that Mastery's negligence was a legal cause of that offense. There is ample evidence of record to justify a reasonable jury deciding both requirements in our favor.

First, A.J.'s deposition testimony establishes that she was the victim of an offense outlined in 18 PA. CONS. STAT. § 5551(7). Relevant here, these offenses include rape under 18 PA. CONST. STAT. § 3121, sexual assault under § 3124.1, statutory sexual assault under § 3122.1,

involuntary deviate sexual intercourse under § 3123, sexual assault under § 3124.1, and aggravated indecent assault under § 3125. A.J.'s rape satisfies each of these offenses, [3] when we need only show one.

Second, Mastery's negligent failures were a legal cause of A.J.'s injuries. In Pennsylvania, courts use the "substantial factor" analysis to determine when something is a legal cause of an injury.

The "substantial factor" standard presents a low bar for plaintiffs. It generally presents a jury question where there is essentially any basis to link a negligent act and an injury. For instance, in a "failure to detect cancer" case, it is enough to show that the doctor failed to timely detect the cancer and that the failure created at least some increased risk of injury. *Mitzelfelt v. Kamrin*, 584 A. 2d 888, 892 (Pa. 1990).

In explaining that rule, the Pennsylvania Supreme Court explained what constitutes sufficient evidence when "there was a possibility that the harm would have occurred, even in the absence of negligence." It explained: "[O]nce a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Id.* at 892 (citing *Hamil v. Bashline*, 392 A.2d 1280, 1286 (Pa. 1978)). While this is a medical-malpractice case, it sets forth the standard in the worst possible case for plaintiffs: where the injury could have occurred even if the defendant was not negligent.

---

[3] To take only one example, "sexual assault" occurs when someone "engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 PA. CONS. STAT. § 3124.1

Applying the "substantial factor" analysis, we have presented more than ample evidence to get to a jury. We have shown Mastery's failures. We have presented not only facts but also expert testimony to show that those failures increased the risk to A.J. That is more than enough to conclude that Defendants' actions were a legal cause of A.J.'s injuries.

### E.        There is ample evidence to support punitive damages.

Defendants' argument against punitive damages is contrary to this Court's last opinion, misses the point, and fails on its own terms. Most simply, this Court found that the actions we alleged and have now supported with evidence support punitive damages. There is no reason for this Court to alter its last decision.

Delving into the evidence, Defendants ignore the bulk of it. They claim that our only evidence supporting punitive damages is our claim that Defendants did not act "promptly and reasonably" in responding to A.J.'s abuse. But we have also explained that: (1) Defendants are legally responsible for A.J.'s rape; (2) Defendants forced A.J. to address her rape in front of her rapist and his father; (3) Defendants punished A.J. for the purported offense of being raped; (4) Defendants failed to do anything about a long-standing pattern of sexual abuse and harassment; and (5) Defendants affirmatively concealed that very pattern not only from us but also the OCR. These events reflect the intentional, willful, wanton, or reckless conduct necessary to support an award of punitive damages under Pennsylvania law.

**F.      Defendants' motion is not yet ripe because a discovery dispute remains pending.**

Defendants' motion for summary judgment is not yet ripe. There is a potentially critical outstanding discovery motion. We do not yet believe that Defendants have produced the full accounting of the history of sexual harassment and abuse at Mastery.

This Court should defer any ruling on summary judgment until after disposition of the pending sanctions motion for two reasons. First, under Rule 56(a), Defendants cannot demonstrate the absence of a dispute of material fact if it is currently withholding critical records. Second, under Rule 56(d), this Court may defer ruling on a summary-judgment motion where the responding party cannot "cannot present facts essential to justify its opposition." While we believe what we have already is more than enough to defeat summary judgment, this Court should simply defer ruling on the motion until the discovery dispute is resolved. The pattern of misconduct at Mastery is critical to our motion. This Court should have a full picture of it before deciding this dispute.

## V.        CONCLUSION

We respectfully request that this Court deny Defendant's summary-judgment motion.

Respectfully submitted,

**SCHATZ & STEINBERG, P.C.**

By:        /s/ Steven J. Schatz
Steven J. Schatz, Esquire (Pa. ID #84509)
S. Philip Steinberg, Esquire (Pa. ID #87252)
Philadelphia, PA 19102
215-845-0250
sschatz@snfirm.com
psteinberg@s2firm.com

**THE PEARLMAN LAW FIRM, PLLC**

By:        /s/ Jason L. Pearlman
Jason L. Pearlman, Esquire (Pa. ID #93879)
Two Bala Plaza, Suite 300
Bala Cynwyd, PA 19004
610-660-7793
jpearlman@pearlmanlawfirm.com

DATED: March 16, 2022                    *Attorneys for Plaintiff A.J*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| A.J. | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 2019-CV-1458-rbs |
| | : | |
| Master Charter High School, et al. | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically and that is available for viewing and downloading from the ECF system. The filing of this paper via ECF served all defendants because their counsel are Filing Users.

Respectfully submitted,

**SCHATZ & STEINBERG, P.C.**

By: _____/s/ Steven J. Schatz_____
Steven J. Schatz, Esquire (Pa. ID #84509)
S. Philip Steinberg, Esquire (Pa. ID #87252)
Philadelphia, PA 19102
215-845-0250
sschatz@snfirm.com
psteinberg@s2firm.com