IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A.J. | : |
| | : CIVIL ACTION |
| v. | : |
| | : NO. 19-1458 |
| MASTERY CHARTER | : |
| HIGH SCHOOL, ET AL. | : |

### MEMORANDUM

**SURRICK, J.**                                                                 **SEPTEMBER 15, 2022**

We previously denied Defendants' Motion for Judgment on the Pleadings (ECF No. 23) as to three of Plaintiff's claims: violations of Title IX (Count I), intentional infliction of emotional distress (Count III), and breach of fiduciary duty (Count IV). (ECF No. 29.) Defendants now move for summary judgment on those same claims. (ECF No. 70.) Discovery has revealed that the reasons for denying Defendants' previous motion are not supported by the undisputed facts. Defendants' Motion for Summary Judgment will be granted.

### I. BACKGROUND

This case arises out of an alleged sexual assault of Plaintiff A.J, then a 7th grade student, by another student, R.H., in the auditorium of Pastorius Elementary School on May 27, 2016. R.H. filmed the encounter without Plaintiff's knowledge. (Pl's. Written Stmt. from June 9, 2016, ECF No. 71-17.; R.H.'s Written Stmt. from June 9, 2016, ECF No. 71-18.) Defendant Hillary Meserve was the principal at the time of the incident, and Defendant Eric Langston was the assistant principal. (Meserve Dep. at 14:7-17, ECF No. 71-1; Langston Dep. at 39:12-40:10, ECF No. 71-11.)

Langston first learned of the video on June 9, 2016—nearly two weeks after the incident occurred—when another student informed him that she had the video on her cell phone. (Langston Invest. Notes at 2, ECF No. 71-8.) Prior to this date, Langston heard rumors of sexual activity between two students on school property, but he was unable to ascertain who was involved. (*Id.*; Langston Dep. at 132:11-133:16.) Langston had the video transferred to his phone and deleted from the student's phone. (Langston Invest. Notes at 2.) Langston took the video to Principal Meserve, and he then contacted the students' families and the police. (*Id.*; Langston Dep. at 133:22-134:11.)

On the same day, Langston questioned Plaintiff and R.H. about the video. (Langston Invest. Notes at 2.) Plaintiff admitted that she was involved in the video. (*Id.*; Pl.'s Dep. at 113:16-114:3, ECF No. 71-7.) At Langston's request, Plaintiff wrote a statement while in a room by herself. (Pl.'s Dep. at 114:16-115:12.) Plaintiff's written statement reads:

> I was in there about to pray when [R.H.] came in their and he said want to hit but I said no then he just kept on so then I said I can't I never did this before and he said it's ok so then he pulled my dress up and pulled my under wear down a little and I was scared to do it but I did it anyway and he pulled his thing out and tryed to put it in me and I said it hurt so he stopped and he left. We was in the auditorium. [A]nd I did not know he was recording me. This happened three weeks ago on a [F]riday. [*Sic*]

(Pl's. Written Stmt. from June 9, 2016.)

Langston thought that Plaintiff's written statement was inconsistent with what he observed in the video. (Langston Dep. at 81:15-85:9.) After receiving written statements from both students, Langston held a meeting at the school with Plaintiff, Plaintiff's grandmother, R.H., R.H.'s father, and two police officers. (Langston Invest. Notes at 2-3; Pl.'s Dep. at 117:17-118:3.) At that meeting, Plaintiff stated that the incident "was her fault." (Pl.'s Dep. at 118:4-

2

14.) Plaintiff also stated that she initially told R.H. "no," but then said "okay." (Pl.'s Dep. at 118:23-119:3.) Plaintiff never stated to school officials that she was raped, and her grandmother informed the police officers at the meeting that she did not want to press charges. (Pl.'s Dep. at 119:16-120:6.) Plaintiff now states that she made false statements during this meeting at the school. (Pl.'s Dep. at 118:23-119:10.)

Later that same day, Plaintiff went to Children's Hospital of Philadelphia. (Pl's. Dep. at 123:22-124:11; CHOP Records from June 9, 2016, at 469, ECF No. 71-19.) The records from CHOP note that Plaintiff recently had "consensual" intercourse and that there was "[n]o concern for rape, no trauma." (CHOP Records from June 9, 2016, at 469-70.) Plaintiff affirmed that the encounter with R.H. was consensual in two subsequent trips to CHOP in June of 2016. (CHOP Records from June 13, 2016, at 518; CHOP Records from June 27, 2016, at 531.) The Philadelphia Police Department also concluded that the incident was consensual and that no charges should be filed. (Request for Case Decision, ECF No. 71-20.) The U.S. Department of Education's Office for Civil Rights found that Plaintiff's written statement was ambiguous as to whether she consented to sex with R.H., and it found that "[T]he School conducted a prompt and equitable investigation of the incident[.]" (U.S. Dep't. of Ed. OCR Report at 7, 10, Defs.' Ex. T, ECF No. 71-3.)

Defendants suspended both students for the remainder of the school year. (Pl.'s Dep. at 120:7-22; Meserve Dep. at 109:2-7.) In addition, R.H. was not allowed to attend any 8th grade activities, including graduation. (Meserve Dep. at 109:2-7.) Plaintiff could return to the school the next year. (Pl.'s Dep. at 120:7-22.)

3

Since 2013, Pastorius has been operated by Defendant Mastery, a charter network in the region with a total enrollment of about 14,500 students. (Gordon Dep. at 33:11-34:15, ECF No. 71-9; Mgmt. Agreement, ECF No. 71-10.) Before that, Pastorius was part of the School District of Philadelphia. (Pl's. Dep. at 43:5-11.) When Mastery took over operations, it was not provided historical discipline records for students who were no longer at the school. (Gordon Dep. at 158: 13-163:15.) It was also not provided with details of incidents that occurred before it operated the school. (*Id.*)

Mastery provided students, including Plaintiff, with a Student Handbook that prohibited sexual harassment against students and employees. (Langston Dep. at 127:5-129:21; Student-Parent Handbook 2015-2016 at 21-22, ECF No. 71-6.) The Student Handbook also stated that all students are entitled to equal educational opportunities and that "students shall respect the rights of other students to receive an education in an atmosphere that is conducive to learning and free from discriminatory practices." (Handbook at 13.) The Student Handbook provided that both sexual harassment and sexual misconduct—whether consensual or non-consensual—were subject to discipline by the school and potentially law enforcement. (Handbook at 21.)

There are no reported incidents of students engaging in sexual intercourse at Pastorius from January 1, 2013 through May 27, 2016, the date of the incident between Plaintiff and R.H. (Incident Reports, ECF No. 71.) One incident of allegedly non-consensual oral sex between students occurred six days after the incident that is the subject of this lawsuit. (*Id.* at 16.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

4

R. Civ. P. 56(a). "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). When the non-moving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the moving party carries this initial burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1). At summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

The facts alleged in Plaintiff's Complaint are serious and disturbing. The incident that gave rise to this case should not occur at any school. Even though we are mindful of the severity of the allegations throughout our analysis, we are also mindful that the question before us is not whether the incident should have occurred. The issue is whether Plaintiff can support a claim under the relevant laws based on what school leaders knew before the incident occurred and how they responded when they learned of the incident. The law recognizes that school administrators cannot prevent all bad things from happening. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648, 651 (1999). It therefore limits recovery in private actions to situations in which administrators knew that a harmful incident was likely to happen and responded in a deliberately indifferent or outrageous manner. *Id.* at 646-47. This is not the case here.

### A. Title IX

To be liable in a private action under Title IX, Defendants must have been "deliberately indifferent to known acts of student-on-student sexual harassment[.]" *Id.* at 646-47. They must have had "actual knowledge" of the acts, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), and "the deliberate indifference must [have], at a minimum, cause[d] [Plaintiff] to undergo harassment or ma[d]e [her] liable or vulnerable to it." *Davis*, 526 U.S. at 644-45. "[T]here is a high bar to establish liability for deliberate indifference under Title IX[.]" *Hall v. Millersville Univ.*, 22 F.4th 397, 407 (3d Cir. 2022). Though school administrators must "respond to known peer harassment in a manner that is not clearly unreasonable," they do not need to "purg[e] their schools of actionable peer harassment or . . . engage in particular disciplinary action" to avoid liability for private actions under Title IX. *Davis*, 526 U.S. at 648-49.

In our prior decision denying Defendants' Motion for Judgment on the Pleadings, we credited the allegations in Plaintiff's Complaint that Defendants were aware of a pattern of student-on-student sexual misconduct that appeared in news reports in 2008, and that there was an additional incident from 2016 that put Defendants on notice of the likelihood of this type of misconduct. We also credited Plaintiff's allegations that Defendants mishandled the investigation into the incident with Plaintiff—particularly the allegation that Defendants waited thirteen days to contact Plaintiff's family about the incident—and that Defendants lacked any Title IX policy. After the close of discovery, these allegations are not supported by the record, and Defendants are entitled to summary judgment. *See id.* at 649 ("In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict,

could not identify a response as not 'clearly unreasonable' as a matter of law.").

### 1. Defendants did not have actual knowledge that an incident like this was likely to happen on school property.

There were no incidents of students engaging in sexual intercourse on school grounds in the three years Defendants operated Pastorius prior to this incident. Though Plaintiff cites other incidents of student misbehavior, they do not rise to the level of the incident with Plaintiff. They are a far cry from sexual intercourse on school property. In addition, we "must bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Davis*, 526 U.S. at 651. Students of this age say and do inappropriate things, sometimes of a sexual nature; it does not follow that students who engage in the conduct described in these reports are likely to engage in the conduct Plaintiff alleges, or that Defendants should have expected this far more serious conduct to occur on school grounds. If these incidents of inappropriate comments, movement, and touching sufficed to establish actual knowledge of a likelihood of student-on-student rape inside the school, then nearly every middle school administrator in the country would have actual knowledge for Title IX purposes.

As another basis for actual knowledge, Plaintiff makes much of news reports from 2008 detailing sexual conduct at Pastorius. However, general news reports of sexual misconduct in 2008—five years before Defendants took over the school and eight years before the incident involving Plaintiff—are too far removed to provide a basis for Defendants to have actual knowledge of a pattern of student-on-student sexual misconduct inside the school in 2016. All the more so when Defendants never received details of incidents or disciplinary records for events that occurred at the school prior to taking over operations of Pastorius. In addition, the students who were involved in the 2008 incidents had left the school by the time Plaintiff was in

7th grade. The fact that some students in one school year engaged in certain egregious conduct does not make it likely that different students will engage in the same egregious conduct eight years later—especially when the school has undergone a change in management and there has not been a single incident of this nature in the three years since the management change.

The only other incident that comes close to the nature of this incident—two students engaged in possibly non-consensual oral sex in a classroom—happened *after* the incident in this lawsuit. (*See* Incident Reports at 16, ECF No. 71.) It cannot support a finding that Defendants had actual knowledge of the likelihood of a sexual assault at the time of the incident with Plaintiff and were deliberately indifferent in a way that subjected Plaintiff or made Plaintiff vulnerable to an assault.

## 2. Defendants' response to the incident was not "clearly unreasonable."

Nothing about Defendants' response supports a finding of deliberate indifference. Far from refusing to act, Defendants responded immediately once they learned of the video. They consulted with appropriate officials and family members and investigated the incident. It is not our place to second-guess Defendants' disciplinary decisions following their investigation. *See Davis*, 526 U.S. at 648 ("In fact, as we have previously noted, courts should refrain from second-guessing the disciplinary decisions made by school administrators.").

Though Plaintiff now concedes that Langston did not wait thirteen days to contact Plaintiff's family after learning of the video, she insists the fact that Langston "responded more promptly to the issue than we believed at the outset" is "immaterial." (Pl.'s Opp. to MSJ at 22, ECF No. 72.) We did not view it as immaterial in our prior decision. (Op. at 12, 14, ECF No. 29.) The egregiousness of the alleged thirteen-day delay was one of the primary allegations that

8

supported a finding that Defendants acted with deliberate indifference in their handling of the investigation. We now know that Plaintiff's allegation is not correct.

One of Plaintiff's other arguments as to why Defendants' response was deliberately indifferent is that Defendants placed Plaintiff in the same room as R.H. and his father at the June 9th meeting. Aside from the Supreme Court's clear instruction that we should not substitute our hindsight judgment for that of school leaders in these situations, *Davis*, 526 U.S. at 648, the record does not show that Defendants were clearly unreasonable in having all parties in the same room for this meeting. Defendants acted reasonably based on the information available to them at the time of their investigation. At the very least, the record is ambiguous on the issue of consent, as the Department of Education also found. For example, Plaintiff told the school administrators that the incident was her "fault." However, Plaintiff's written statement seems conflicted as to whether the encounter was fully consensual. (*See* Pl's. Written Stmt. from June 9, 2016) ("I said no then he just kept on so then I said I can't I never did this before and he said it's ok so then he pulled my dress up and pulled my under wear down a little and I was scared to do it but I did it anyway[.]"). While Plaintiff never stated that she was raped, there are complex reasons why a victim of sexual assault might struggle to assert that she was in fact assaulted. Nevertheless, the issue is not ultimately whether the encounter was consensual. The issue at hand for purposes of potential Title IX liability is what Defendants knew at the time they conducted their investigation and whether they responded in a way that was clearly unreasonable. Nothing from the relevant timeframe shows that it was clearly unreasonable for Defendants to conclude that the encounter was consensual and to have all parties together for the meeting at the school. Indeed, the trained professionals at CHOP and the Philadelphia Police

Department also accepted Plaintiff's later statements—made outside the presence of R.H. and his father—that the encounter was consensual.

Finally, a school's failure to have a specific policy and grievance procedures is not enough on its own to establish liability in a private action under Title IX. *Gebser*, 524 U.S. at 291-92. As Plaintiff cannot establish the essential elements of actual knowledge and deliberate indifference, any deficiencies in Defendants' policies have no bearing on Defendants' potential liability in this private action under Title IX.

Because no reasonable jury could find that Defendants had actual knowledge that an incident like this was likely to happen at school and responded with deliberate indifference to the likelihood of harm or to the incident itself, Defendants are entitled to summary judgment on Plaintiff's Title IX claim.

### B. Intentional Infliction of Emotional Distress (IIED)

We found that Plaintiff's claim for intentional infliction of emotional distress survived Defendants' challenge prior to discovery because Plaintiff sufficiently alleged that the individual Defendants acted in an "extreme and outrageous" way. *Hoy v. Angelone*, 720 A.2d 745, 753 (Pa. 1988). A court "must make the initial determination of whether a defendant's conduct was so extreme and outrageous that recovery [for IIED] may be justified." *Gray v. Great Valley Sch. Dist.*, 102 F. Supp. 3d 671, 683 (E.D. Pa. 2015) (quoting *Small v. Juniata College*, 682 A.2d 350, 355 (Pa. Super. Ct. 1996)). Outrageous conduct is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kazatsky v. King David Mem'l Park*, 527 A.2d 988, 991 (Pa. 1987). As with Plaintiff's Title IX claim, the information revealed

during discovery now requires a different conclusion.

We previously found that the following allegations demonstrated extreme and outrageous conduct: (1) that Defendants mishandled the investigation into the incident, particularly by waiting thirteen days to contact Plaintiff's legal guardian and concluding that the incident was consensual; (2) that Defendants did not discipline R.H.; and (3) that the individual Defendants intentionally mishandled the investigation to deflect blame from themselves. (Op. at 19-20, ECF No. 29.) Given the near total overlap with the allegations discussed in connection with Plaintiff's Title IX claim, we will not repeat our findings on these allegations following the close of discovery. For the same reasons that these allegations either are simply untrue or do not support a finding of deliberate indifference, they also do not support a finding that the individual Defendants behaved in an extreme and outrageous way. Furthermore, Plaintiff has not provided any evidence from which to conclude that Defendants acted with bad intentions. Because we find that no reasonable jury could find that Defendants' conduct was extreme and outrageous, we do not reach Defendants' argument that they are entitled to immunity under Pennsylvania's Tort Claims Act, 42 Pa. C.S.A. § 8541, *et seq*.

### C.      **Breach of Fiduciary Duty**

Assuming Defendants owed a fiduciary duty to Plaintiff, no reasonable jury could conclude that Defendants breached their duty. We previously found that Plaintiff's allegations on her fiduciary duty claim were sufficient because Defendants failed to comply with Title IX and Defendants waited thirteen days to contact Plaintiff's legal guardian about the video. As explained at length above, those findings are inconsistent with the undisputed record and our analysis at the current procedural posture of the case.

Now, Plaintiff makes additional arguments on Defendants' alleged breach that are all premised on the idea that Defendants should have concluded immediately that Plaintiff was raped. (Pl.'s Opp. to SJ at 29, ECF No. 72.) As explained above, this premise is not supported by the information available to Defendants at the time of their investigation, and it is also inconsistent with Plaintiff's medical files and the Philadelphia Police Department's conclusions from the same time. In addition, there is nothing in the record to support the conclusion that Defendants determined that the incident was consensual in bad faith for their own personal gain or advantage, which is required to find that Defendants breached a fiduciary duty. *In re Scott's Estate*, 316 A.2d 883, 885 (Pa. 1974); *Young v. Kaye*, 279 A.2d 759, 763 (Pa. 1971); *Dinger v. Allfirst Fin., Inc.*, 82 F. App'x, 261, 265 (3d Cir. 2003); *Manning v. Temple Univ.*, No. 03-4012, 2004 WL 3019230, at *10 (E.D. Pa. Dec. 30, 2004), *aff'd*, 157 F. App'x 509 (3d Cir. 2005). In support, Plaintiff relies on the boilerplate proposition that humans prefer not to be investigated and subjected to litigation, so therefore Defendants must have intentionally come to a knowingly false conclusion that the encounter was consensual to "conceal[] wrongdoing." (Pl's. Opp. to SJ at 29-30.) In addition to its logical flaws, this argument is inconsistent with the record that shows that Langston invited police officers to the meeting. Defendants' choice to promptly notify law enforcement authorities is incompatible with a finding that they attempted to sweep this incident under the rug for their own personal benefit. If law enforcement thought there was something to prosecute here, it could have done so. Far from avoiding scrutiny for their own personal benefit, Defendants conducted an open investigation and notified outside authorities. Defendants also did not interfere with Plaintiff's ability to press charges at the time of their investigation, as Plaintiff's grandmother discussed the possibility but ultimately declined to do so

12

at the meeting.

As with Plaintiff's IIED claim, we decline to reach the issue of immunity under Pennsylvania's Tort Claims Act because we find that no reasonable jury could conclude that Defendants breached any fiduciary duty owed to Plaintiff.

### D.   Punitive Damages

Because we find that Defendants are entitled to summary judgment on Plaintiff's substantive claims, we need not address the parties' arguments as to possible damages.

### IV.   CONCLUSION

For the foregoing reasons, we will grant Defendants' Motion for Summary Judgment on all claims.

                                                BY THE COURT:

                                                */s/ R. Barclay Surrick*
                                                **R. BARCLAY SURRICK, J.**